(No. 58395— )

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. DOUGLAS CHRISTENSEN, Appellant.

*Opinion filed June 6, 1984.*

Daniel D. Yuhas, Deputy Defender, and Jonathan Hale, Assistant Defender, of the Office of the State Appellate Defender, of Springfield, for appellant.

Neil F. Hartigan, Attorney General, of Springfield (Mark L. Rotert and Terence M. Madsen, Assistant Attorneys General, and Matthew Monathan, law student, of Chicago, of counsel), for the People.

JUSTICE SIMON delivered the opinion of the court:

On April 16, 1982, the circuit court of Woodford County dismissed a 15-count indictment against the defendant, Douglas Christensen, because he had been denied a speedy trial under both section 103—5 of the Code of Criminal Procedure of 1963 (the speedy-trial

statute) (Ill. Rev. Stat. 1979, ch. 38, par. 103—5) and the Interstate Agreement on Detainers (Ill. Rev. Stat. 1979, ch. 38, par. 1003—8—9). The appellate court reversed. (113 Ill. App. 3d 938.) We granted the defendant's petition for leave to appeal to this court. 87 Ill. 2d R. 315.

At the time the defendant was originally indicted on July 24, 1980, on 10 counts of murder, two counts of involuntary manslaughter, two counts of aggravated battery, and one count of concealment of a homicidal death, he was serving a sentence for an unrelated crime in the Federal penitentiary at Texarkana, Texas. On August 8, 1980, the circuit court of Woodford County issued a writ of *habeas corpus ad prosequendum,* and on September 12, 1980, a request for temporary custody of the defendant was filed under the provisions of article IV(a) of the Interstate Agreement on Detainers (Ill. Rev. Stat. 1979, ch. 38, par. 1003—8—9, art. IV(a)). The defendant was sent to Woodford County, taken into custody there on October 19, 1980, and arraigned on October 27. On December 19, 1980, after the defendant was granted a continuance, trial was set for February 17, 1981.

On February 2, a certificate was issued on the prosecutor's motion to compel the attendance of witness Craig Myers. On February 13, 1981, after Myers failed to appear in Illinois voluntarily to testify for the State in accord with an earlier agreement, the prosecution moved for a 60-day continuance. The trial court found that there was good cause for the continuance under the Interstate Agreement on Detainers, and the prosecution requested that the court not make its ruling under the Illinois speedy-trial statute which allows the State to request an extension of no more than 60 days beyond the 120-day speedy-trial period when a witness cannot be located. The trial court granted a continuance until April 6, 1981, but on March 17, the prosecutor indicated to the court that Myers was still missing and unlikely to be

found soon. The State moved to dismiss the case with leave to reinstate the charges after Myers was found. When the trial court responded that this could not be done, the prosecutor moved to nol-pros the indictment, and stated on the record that the State intended to refile the charges after Myers was located. The defendant was returned to Federal custody in Texas three days later.

Seven months later, on October 29, 1981, a new indictment was returned against the defendant; all 15 counts were identical to the charges in the indictment that had been nol-prossed. On November 6, 1981, the State requested temporary custody of the defendant, and the Federal authorities offered to deliver temporary custody to the Woodford County authorities as of February 21. On February 26, the defendant filed a *pro se* demand for a speedy trial under the speedy-trial statute (Ill. Rev. Stat. 1979, ch. 38, par. 103—5). The trial judge calculated that the defendant's incarceration from October 19, 1980, through the date of the *nolle prosequi* on March 17, 1981, excluding the continuance requested by the defendant, which tolled the statute, accounted for 89 days of the 120-day speedy-trial period. Since the defendant was reindicted on identical charges, the trial judge included the entire period from March 17, 1981, through April 16, 1982. The trial judge further held that even if this entire period was not includable, the period from February 21, 1982, when the defendant was again made available by the Federal authorities for return to Woodford County, had to be counted. The appellate court held that the *nolle prosequi* tolled the speedy-trial period, and that article IV(e) of the Interstate Agreement on Detainers did not apply.

The question to be decided is whether the indictment against defendant was improperly dismissed under either the Interstate Agreement on Detainers or the Illinois speedy-trial statute. We turn first to the Interstate

Agreement on Detainers.

Article IV(e) of the Interstate Agreement on Detainers provides:

> "If trial is not had on any indictment, information or complaint contemplated hereby prior to the prisoner's being returned to the original place of imprisonment pursuant to Article V(e) hereof, such indictment, information or complaint shall not be of any further force or effect, and the court shall enter an order dismissing the same with prejudice." Ill. Rev. Stat. 1979, ch. 38, par. 1003—8—9, art. IV(e).

The trial judge read the plain language of article IV(e) as requiring dismissal of the second indictment since, in his view, the two indictments were identical and had to be treated as one. The appellate court viewed the two indictments, despite the identity of their contents, as separate; it reasoned that once the trial court nol-prossed the first indictment, there no longer was any case before the court to dismiss with prejudice. 113 Ill. App. 3d 938, 941.

We disagree with the construction of article IV(e) proposed by the State and adopted by the appellate court. Such a narrow reading of the term "indictment" is inconsistent with the purposes of the agreement as stated in article I, and with the mandate of article IX that "[t]his agreement shall be liberally construed so as to effectuate its purposes." (Ill. Rev. Stat. 1979, ch. 38, par. 1003—8—9, art. IX.) Article I provides, in pertinent part:

> "[C]harges outstanding against a prisoner, detainers based on untried indictments, informations or complaints, and difficulties in securing speedy trial of persons already incarcerated in other jurisdictions, produce uncertainties which obstruct programs of prisoner treatment and rehabilitation. ***" Ill. Rev. Stat. 1979, ch. 38, par. 1003—3—9, art. I.

The State suggests that the purpose of the interstate agreement is to avoid leaving untried indictments when prisoners are returned to their original places of incarcera-

tion. While we agree that avoiding the shuttling back and forth of prisoners is one goal of the interstate agreement (*Neville v. Friedman* (1977), 67 Ill. 2d 488), it is not the only one. The broad language of article I contemplates many kinds of occurrences which can delay the final disposition of charges and may result in two types of uncertainties. Questions about where the prisoner will be and for how long prevent development of a coherent long-term rehabilitation program. Equally important, uncertainties in the prisoner's mind about when a charge once raised will be finally disposed of interfere with his ability to benefit from the rehabilitation programs available to him. *United States v. Mauro* (1978), 436 U.S. 340, 359-60, 56 L. Ed. 2d 329, 346-47, 98 S. Ct. 1834, 1846-47.

Legislation making the United States a party to the agreement was passed with virtually no debate because the Attorney General's office recognized the benefits and supported the bill. (See *United States v. Mauro* (1978), 436 U.S. 340, 353, 56 L. Ed. 2d 329, 342-43, 98 S. Ct. 1834, 1843-44.) The legislative history of that bill, Public Law 91—538, now 18 U.S.C. App. (1982), is relevant, because Congress addressed precisely the question we face here: the effect of State detainers on Federal prisoners. The House and Senate reports were identical, and contained the following observations:

> "The result is to permit the prisoner to secure a greater degree of certainty as to his future and to enable prison authorities to plan more effectively for his rehabilitation and return to society. *** What is more, when detainers are filed against a prisoner he sometimes loses interest in institutional opportunities because he must serve his sentence without knowing what additional sentences may lie before him, or when, if ever, he will be in a position to employ the education and skills he may be developing. Although a majority of detainers filed by States are withdrawn near the conclusion of the Federal sentence, the damage to the rehabilitation program has been done be-

cause the institution staff has not had sufficient time to develop a sound prerelease program." S. Rep. No. 91–1356 and H.R. Rep. No. 91–1018, 91st Cong., 2d Sess. 2-3, reprinted in 1970 U.S. Code Cong. & Ad. News 4864, 4865-66.

The quotation makes it clear that the damage is done by the filing of the detainer, and the problem is not solved until there is a final disposition. In this case, even though the indictment was nol-prossed and the detainer was temporarily withdrawn, as long as the State dangled the possibility of reindictment in the future, the defendant was in precisely the position the interstate agreement was designed to avoid. The purpose of the agreement was to provide for the expeditious and orderly permanent disposition of the matter; that purpose is not achieved by temporary dismissals of indictments which leave both the prisoner and the Federal prison officials subject to all the uncertainties the agreement was designed to alleviate.

Article IV states unequivocally that if trial is not had before the prisoner is returned, the indictment must be dismissed with prejudice. It is the practice of this court to give statutory language its customary meaning, unless so doing would be inconsistent with the purpose of the statute. (*People v. Fink* (1982), 91 Ill. 2d 237, 240; *City of East Peoria v. Group Five Development Co.* (1981), 87 Ill. 2d 42, 46.) Further, criminal statutes are to be strictly construed in favor of the accused. (*People v. Foster* (1983), 99 Ill. 2d 48, 55; *People ex rel. Gibson v. Cannon* (1976), 65 Ill. 2d 366, 371; *People v. Eagle Food Centers, Inc.* (1964), 31 Ill. 2d 535, 539; *People v. Lund* (1943), 382 Ill. 213, 215-16.) In addition, the agreement is a remedial statute, which must be liberally construed in favor of those whose problems it was meant to address. *Cf. United States ex rel. Esola v. Groomes* (3d Cir. 1975), 520 F.2d 830, 836-37; *Commonwealth v. Merlo* (1976), 242 Pa. Super. 517, 522, 364 A.2d 391, 394.

The State's argument that the prosecutor's action furthered rather than hindered the purposes of the statute by returning the defendant at the earliest possible time ignores the complexity of the problem which the interstate agreement was designed to resolve. (*Cf. Hughes v. District Court* (1979), 197 Colo. 396, 401-02, 593 P.2d 702, 706.) By failing to ask for a continuance to a date certain and instead taking the open-ended approach that he could nol-pros the first indictment and reindict at some indefinite time in the future, the prosecutor was seeking to justify exactly the sort of delay that the interstate agreement was designed to avoid. The State in this case had the option of an extension which would toll the speedy-trial period, but chose not to seek it. By asking for a *nolle prosequi* under these circumstances, the prosecutor was attempting an end-run around the time limits of both the agreement and the speedy-trial statute.

This court has recognized only one exception to the literal wording of section IV(e) of the agreement. It is not necessary for the charges to be dismissed with prejudice when the defendant is returned to the sending jurisdiction before trial after a lengthy delay caused by the defendant himself (*Neville v. Friedman* (1977), 67 Ill. 2d 488). This case is not controlled by *Neville.* On the contrary, *Neville* illustrates a distinction long followed by this court in similar situations involving the Illinois speedy-trial statute to which we can look for guidance. Ill. Rev. Stat. 1979, ch. 38, par. 103—5.

This court avoids technical constructions which frustrate the purpose of our State's speedy-trial provisions. Where the delay is attributable to the defendant, the statute is tolled (*People v. Lee* (1969), 44 Ill. 2d 161, 166). In contrast, where the defendant has not caused the delay, the State is not permitted to engage in technical maneuvers to toll the statute. Voluntary dismissal and subsequent refiling of identical charges do not toll the statute (*People*

*v. Fosdick* (1967), 36 Ill. 2d 524, 528; *People v. Patheal* (1963), 27 Ill. 2d 269), nor does voluntary relinquishment of the prisoner to another county (*People v. Swartz* (1961), 21 Ill. 2d 277). *Fosdick* turns on the State's use of a voluntary dismissal to avoid the 120-day rule established by the Illinois statute. (*People v. Davis* (1983), 97 Ill. 2d 1, 11-14; *People v. Bixler* (1971), 49 Ill. 2d 328, 335; *People v. Fosdick* (1967), 36 Ill. 2d 524, 528-29.) The logic of these cases applies in the present situation. Where the dismissal was not occasioned by the defendant, but was used by the State to circumvent the interstate agreement, the charges against the defendant must be dismissed with prejudice.

There can be no doubt that the second indictment, containing 15 counts identical to those brought in 1980, was "contemplated," as the term is used in article IV(e), at the time that the prisoner was returned to the Federal authorities. The prosecutor informed the court that he intended to reindict and that he was indifferent as to whether the indictment number was new. To rely now on the use of a separate indictment number to avoid the agreement is an impermissible evasion of the mandate of the agreement.

Because we reach our holding under the Interstate Agreement on Detainers, we do not decide whether the 120-day period under the speedy-trial statute was tolled or, if so, when it began to run again. Article IV(e) states only that the indictment must be dismissed with prejudice if, as happened here, the prisoner is returned to the original place of imprisonment before trial is had. Once the case was reactivated, whether under the same or a different number, there was a case before the circuit court which it had jurisdiction to dismiss, and article IV(e) required dismissal. For that reason, we reverse the appellate court and affirm the circuit court's order dismissing the case with prejudice.

*Appellate court reversed;*
*circuit court affirmed.*